# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

BARBARA A. CRAIG                          Case No. 1:19-cv-764
     Plaintiff,                          Barrett, J.
                                           Litkovitz, M.J.

vs.

COMMISSIONER OF                           **REPORT AND**
SOCIAL SECURITY,                          **RECOMMENDATION**
     Defendant.

Plaintiff Barbara A. Craig brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying her application for supplemental security income (SSI). This matter is before the Court on plaintiff's statement of errors (Doc. 12), the Commissioner's response in opposition (Doc. 18), and plaintiff's reply (Doc. 21).

## I.      Procedural Background

Plaintiff filed her application for SSI in April 2013, alleging disability since April 18, 2013, due to asthma, chronic obstructive pulmonary disease (COPD), mental health problems, stomach problems, numbness in her hands, insomnia and "bad angles." The application was denied initially and upon reconsideration. Plaintiff, represented by non-attorney Brook D. Anderson, had a hearing before administrative law judge (ALJ) Thuy-Anh T. Nguyen on February 4, 2016. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On May 31, 2016, the ALJ issued a partially favorable decision finding plaintiff disabled as of January 7, 2016 under Listing 3.02A, which encompasses "[c]hronic respiratory disorders due to any cause except CF with[,]" as applicable here, an FEV1 of less than 1.15. *See*

20 C.F. R. § 404, Subpart P, App. 1, Part A1.  The Appeals Council granted plaintiff's request for review and on August 8, 2017, vacated the ALJ's hearing decision in full and remanded.  On remand, ALJ Nguyen held a hearing on April 17, 2018, at which plaintiff and a different VE appeared and testified.  On July 19, 2018, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act.  On July 31, 2019, the Appeals Council denied plaintiff's request for review, making the decision of the ALJ the final administrative decision of the Commissioner.

## II.   Analysis

### A.   Legal Framework for Disability Determinations

To qualify for SSI, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment—i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities—the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)) (remaining citations omitted). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

**B.     The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. [Plaintiff] has not engaged in substantial gainful activity since April 18, 2013, the application date (20 CFR 416.971 *et seq.*).

2. [Plaintiff] has the following severe impairments: chronic obstructive pulmonary disease/asthma; disorders of the lumbar spine; obesity; major depressive disorder; personality disorder; panic/anxiety disorder; schizophrenia; and history of alcohol and substance abuse disorder (20 CFR 416.920(c)).

3. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the [ALJ] finds that [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except [plaintiff] can frequently climb ramps or stairs, but occasionally climb ladders, ropes, or scaffolds.  [Plaintiff] must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and unprotected heights.  [Plaintiff] can understand, remember, and carry out simple, routine tasks in a setting without demands for fast pace or high production standards.  [Plaintiff] retains the capacity for occasional interaction with the public, coworkers, and supervisors. [Plaintiff] is limited to low stress jobs defined as having occasional decision making and occasional changes in the work setting.

5. [Plaintiff] is unable to perform any past relevant work (20 CFR 416.965).[1]

6. [Plaintiff] was born [in] . . . 1964 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  On August 15, 2014, [plaintiff] turned 50, which is defined as closely approaching advanced age (20 CFR 416.963).

7. [Plaintiff] has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 416.969 and 416.969(a)).[2]

10. [Plaintiff] has not been under a disability, as defined in the Social Security Act, since April 3, 2013, the date the application was filed (20 CFR 416.920(g)).

---

[1] Plaintiff's past relevant work was as a grocery cashier, which is a light, semi-skilled position.  (Tr. 25, 55).
[2] The ALJ relied on VE William J. Kiger's testimony to find that plaintiff would be able to perform the requirements of light, unskilled occupations such as a housekeeper (70,000 jobs nationally), a cafeteria attendant (60,000 jobs nationally), and a router (54,000 jobs nationally).  (Tr. 26, 57).

(Tr. 16-27).

### C.    Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*,

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination.  Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required

even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed

to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.  Medical Evidence

#### 1.  Treatment prior to alleged onset of disability

In August 2011, two years prior to her alleged onset date, plaintiff presented to the emergency room at UC Health complaining of shortness of breath.  (Tr. 544).  She had a known history of asthma, COPD, and anxiety.  (*Id.*).  She had run out of Albuterol and asthma medications and reported she continued to smoke.  (*Id.*).  On examination, plaintiff was found to be in mild distress due to shortness of breath, and her lungs had diffuse inspiratory and expiratory wheezing throughout all lung fields, without rhonchi or rales.  (Tr. 545).  She was initially found to be tachycardic, but it resolved.  (Tr. 545).  Plaintiff was prescribed DuoNeb, Albuterol, and Prednisone.  (Tr. 545-46).

Plaintiff was seen by a nurse practitioner at Neighborhood Health Care in February 2013. (Tr. 585-89).  Plaintiff was diagnosed with asthma (moderate, persistent, poorly controlled) and started a Qvar inhaler.  (Tr. 585).  She was still smoking.  (*Id.*).  The physical examination reported lungs clear to auscultation and normal respiratory effect.  (Tr. 588).

#### 2.  Jennifer Wischer Bailey, M.D., consultative examination

Jennifer Wischer Bailey, M.D., examined plaintiff for disability purposes on September 19, 2013.  (Tr. 600-09).  Plaintiff's chief complaint was shortness of breath, but she also reported knee and ankle pain.  (Tr. 605).  On examination, plaintiff had expiratory and inspiratory wheezing in all fields and frequent cough, but she had no rales, rhonchi, or evidence of cyanosis.

(Tr. 606). She ambulated with a normal gait and was comfortable in both sitting and standing positions. (*Id.*). Her cervical spine range of motion was normal, and her muscle and grasp strength were well-preserved over the upper extremities. (*Id.*). Pinprick and light touch were diminished from hands to elbows. (*Id.*). Plaintiff's manipulative ability was normal bilaterally and she exhibited no muscle atrophy. (*Id.*). She had some numbness over her upper extremities, the etiology of which was unknown. (Tr. 607).

Dr. Bailey assessed plaintiff with shortness of breath with heavy tobacco abuse, asthma exacerbation, exogenous obesity, bilateral upper extremity numbness consistent with ulnar neuropathy, bilateral knee and ankle pain, and sinus tachycardia. (*Id.*). Dr. Bailey noted that plaintiff continued to smoke heavily and discontinuation of the use of tobacco products would be beneficial. (*Id.*). She also determined that plaintiff appeared capable of performing a mild to moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects; she had no difficulty reaching, grasping, or handling objects; she had no visual or communication limitations; and she would do best in a dust-free environment. (Tr. 608).

In November 2013, in connection with her disability claim, plaintiff underwent a pulmonary function test, which reflected a forced expiratory volume (FEV1) of 1.24. (Tr. 615). In January 2014, she underwent a diffusing capacity test that showed normal diffusion. (Tr. 625).

### 3.    Primary care

In July 2015, plaintiff was seen by her primary care physician at UC Health for a follow-up related to her persistent uncomplicated asthma, lower back pain, hypothyroidism, obesity, depression, and anxiety.  (Tr. 1097).  She reported asthma exacerbations every couple of months while still smoking and exposed to second-hand smoke.  (*Id.*).  On examination, while reporting wheezing, her pulmonary effort and breath sounds were normal, and she had oxygen saturation of 97%.  (1098-99).  The doctor assessed her condition as an asthma flare, placed her on a short course of steroids, and referred her to the pulmonary clinic.  (Tr. 1099).

In September 2015, CG Medical Associates evaluated plaintiff for pain management covering back pain and cold symptoms.  (Tr. 961).  On examination, she exhibited rhonchi with oxygen saturation of 96%.  (Tr. 961).  She was diagnosed with acute bronchitis and prescribed Prednisone.  (Tr. 961).  When seen one week later, plaintiff exhibited wheezing and oxygen saturation of 96%, but her wheezing and overall condition had improved.  (Tr. 959).  In December 2015, plaintiff reported continued wheezing and coughing, notwithstanding a decrease in smoking to one cigarette per day.  (Tr. 957).  On examination, plaintiff's oxygen saturation was 95% with bilateral wheezing and she was again prescribed Prednisone.  (Tr. 957-58).

Plaintiff was seen at the primary care clinic at UC Hoxworth Medical Center in August 2017.  (Tr. 1203-23).  She reported that she was using her rescue inhaler often and reduced her smoking to one third of a pack per day.  (Tr. 1210).  On examination by Rita Vivian Schlanger, M.D., her lungs were found to be somewhat tight, but she was not wheezing.  (Tr. 1211).  Dr. Schlanger's notes reflect that what had been "moderate persistent" asthma (Tr. 1208) was now

being treated as "severe persistent asthma" (Tr. 1212).  She was referred to pulmonary specialists

for a pulmonary function test.  (*Id.*).  She had not been to a pulmonary follow-up since January

2016 but reported that the lapse in treatment was due to grief and depression related to the death

of her son in late 2016.  (Tr. 1210, 1250, 1258).

### 4.    Pulmonary care

In August 2015, plaintiff consulted with Mitchell Rashkin, M.D., a pulmonologist at UC

Health.  (Tr. 991-1007).  She complained of frequent asthma exacerbations.  (Tr. 996).  On

examination, plaintiff appeared disheveled and smelling of tobacco.  (Tr. 997).  She had an

oxygen saturation of 96%.  (*Id.*).  She exhibited wheezing in all lung fields without rales or

tenderness.  (*Id.*).  Dr. Rashkin found her asthma uncontrolled and not likely to improve until she

stopped smoking and avoided second-hand smoke exposure.  (Tr. 999).  He found her lungs clear

and did not identify any acute cardiopulmonary abnormality.  (*Id.*).

When seen for a follow-up in January 2016, plaintiff reported to Dr. Rashkin that

although she had cut back, she was still smoking.  (Tr. 979).  On examination, plaintiff appeared

disheveled and smelling of tobacco.  (Tr. 980).  She had an oxygen saturation of 97%.  (*Id.*).  She

had wheezing in her right upper, left upper, and left lower lungs without rales or tenderness.

(*Id.*).  A pulmonary function test performed at that visit showed an FEV1 of 0.99.  (Tr. 981-82).

Dr. Rashkin planned a follow-up in four months, noting that he considered seeking an

independent review of the pulmonary function test.  (Tr. 989).

Plaintiff's next pulmonary visit was in January 2018.  (Tr. 1359-94).  Peter Lenz, M.D.,

and pulmonary critical care fellow Ruchira Sengupta, M.D., examined plaintiff, who reported a

productive cough with yellow sputum causing chest and back pain.  (Tr. 1372).  Her oxygen

saturation was 92% and she had bilateral expiratory wheezing on examination with a drop in

peak flow.  (Tr. 1366, 1377).  According to Dr. Sengupta's notes, signed by Dr. Lenz, plaintiff

was "[i]n exacerbation today, with worsening cough, sputum, b/l expiratory wheezing and drop

in peak flow (100L/min)[.]  [P]reviously when she was healthy back in 2016 peak flow was

180/min. . . ."  (Tr. 1377).  She was prescribed Prednisone and Azithromycin.  (*Id.*).  She was

diagnosed with "**Moderate Persistent Asthma vs COPD or COPD/Asthma Overlap**

**Phenotype** with Dx with spirometry confirming obstruction with more fixed ratio FEV1/FVC at

0.46 and FEV1 01.13 L post BD with (+) BD response. . . ."  (Tr. 1380).

### 5.     Musculoskeletal care

In August 2014, plaintiff was seen at the UC Health Orthopedic Surgery Outpatient

Clinic.  (Tr. 832).  Plaintiff reported her back pain worsening over the prior six months, she had

fallen due to weakness, and she had increased pain with standing.  (Tr. 833).  On examination,

plaintiff was unable to walk on her heels or toes and had decreased flexion.  (*Id.*).  X-rays

showed mild multilevel degenerative changes and facet disease of the lumbar spine, invertebral

disc space narrowing at L3-L4 and L4-L5, and evidence of vascular calcifications.  (Tr. 838).

There was no evidence of acute fracture.  (*Id.*).  The physician determined that plaintiff's back

pain was mechanical, nonsurgical, and something she would have to learn to live with.  (Tr.

833).  She was prescribed anti-inflammatories and instructed to start physical therapy.  (*Id.*).

In December 2014, plaintiff rated her back pain at a 10/10 on a 10-point analog pain scale

and described it as a burning sensation.  (Tr. 770).  She was found to be tender on examination

and prescribed Naprosyn and Flexeril.  (Tr. 772-73).  The physician's notes suggested plaintiff

be administered a joint injection if more conservative treatments did not improve the condition.

(Tr. 773).

When seen in January 2015, plaintiff reported no improvement with Voltaren or

Naproxen.  (Tr. 710).  Plaintiff underwent a lumbar spine MRI in March 2015, which showed

mild disc bulging at L3-4 and L4-5 without significant central stenosis.  (Tr. 652).  There was

mild narrowing of the left L3 and L4 foramina without nerve root impingement.  (*Id.*).  At L5-

S1, there was mild disc bulging and some facet arthropathy without significant central stenosis.

The images reflected mild bilateral L5 foraminal narrowing.  (*Id.*).  In May 2015, plaintiff

reported difficulty bending and moving side to side due to back pain.  (Tr. 963).  She was

administered a Toradol shot.  (*Id.*).  The notes from this visit reflect that a follow-up was to

happen that same week with a Dr. Gupta, but there is no evidence in the record of this follow-up.

(*Id.*).

In September 2015, plaintiff was evaluated at UC Health.  (Tr. 1041-60).  She reported

intermittent sharp pain in the middle of her lower back that sometimes radiated down her right

leg.  (Tr. 1057).  An X-ray reflected mild multilevel degenerative changes but no disc-space-

narrowing changes from her prior exam.  (Tr. 1045).  Plaintiff was found to have midline lumbar

tenderness and a decreased range of motion.  (Tr. 1059).  She was assessed with chronic lower

back pain due to degenerative changes and referred for an epidural steroid injection.  (Tr. 1059-

60).  Notes from a December 2015 visit to CG medical associates show that plaintiff failed to

follow up with the orthopedic doctor regarding this treatment. (Tr. 957). She was prescribed Robaxin. (Tr. 958).

A cervical spine CT taken in April 2016 showed mild reversal of the normal cervical lordosis centered at C3-C5, moderate multilevel disc loss that was worst at C5-6, and mild to moderate multilevel osteophytes formation. (Tr. 1173). Bilateral hip x-rays taken in July 2016 showed periosteitis, and the physician noted that a further MRI might be warranted. (Tr. 1146).

### 6. State agency review

Teresita Cruz, M.D., a state agency physician, reviewed plaintiff's file in January 2014 and found that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 116-18). She also determined that plaintiff should never climb ladders, ropes or scaffolds. (Tr. 117). Plaintiff could frequently balance, stoop, crouch, crawl, and kneel but only occasionally climb ramps or stairs. (*Id.*). Plaintiff was also to avoid concentrated exposure to extreme cold or hot, humidity, fumes, odors, dusts, gases, and poor ventilation. (Tr. 117-18).

Leigh Thomas, M.D., reviewed plaintiff's file upon reconsideration in June 2014. (Tr. 134). Because plaintiff alleged worsening breathing, Dr. Thomas believed that a "current [pulmonary function study] was needed." (Tr. 134). Despite confirming transportation for each, plaintiff attended neither of two scheduled consultative examinations. (Tr. 136). Dr. Thomas reported that there was insufficient evidence to evaluate plaintiff's claim from a physical standpoint. (*Id.*).

E.      **Specific Errors**

Plaintiff argues that the ALJ failed to fully develop the record.  Specifically, plaintiff argues that the ALJ refused to obtain relevant and necessary evidence, including a medical expert to assist in the Listing 3.02A determination and a consultative examination regarding her pulmonary function status.  Plaintiff next argues that the ALJ erred in determining that she has the residual functional capacity (RFC) for light work.[3]  Before turning to the ALJ's 2018 decision, the Court examines the Appeals Council's 2017 order vacating and remanding the ALJ's 2016 decision.

1.      **The Appeals Council's 2017 remand order**

The Appeals Council determined that the ALJ's 2016 decision turned on an improper Listing determination.  In this regard, the Appeals Council stated,

> [N]either the decision nor the record indicates that [FEV1] value is "satisfactory" or "reproducible" as required in the preface to Section 3.00.  Specifically, Section 3.00E sets out the technical requirements for pulmonary function testing.  The preface indicates that spirometry values "should represent the largest of at least three satisfactory forced expiratory maneuvers" and goes on to further define the requirement of satisfactory and reproducible test values.  Yet the spirometry test forming the sole basis for the [ALJ]'s finding that [plaintiff]'s impairment meets Listing 3.02A documents only a single FEV1 value.  It likewise contains no discernible data or conclusions about test conditions, reproducibility, effort, and the like, as required by Section 3.00E.
>
> Further evaluation under Listing 3.02A appears to be necessary, and the assistance of a medical expert may be warranted for that purpose.

(Tr. 168).  As a result, the Appeals Council directed the ALJ to,

---

[3] Plaintiff does not argue that the ALJ erred in evaluating her mental impairments; therefore, plaintiff has waived any challenges regarding her mental impairments.  *See Watts v. Comm'r of Soc. Sec.*, No. 1:16-cv-319, 2017 WL 430733, at *11 (S.D. Ohio Jan. 31, 2017), *report and recommendation adopted*, 2017 WL 680538 (S.D. Ohio Feb. 21, 2017) (argument waived where plaintiff did not "develop it legally or factually in the Statement of Errors").

> [o]btain additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 416.912).  The additional evidence may include, if warranted and available, a consultative physical examination and medical source opinions about what the claimant can still do despite her impairments.

(Tr. 169).  It also directed the ALJ to, "if necessary, obtain evidence from a medical expert regarding the nature, severity, and limiting effects of the claimant's impairments, as well as whether the claimant's impairments meet or medically-equal the severity of an impairments listed in 20 CFR Part 404, Subpart P, Appendix 1."  (*Id.*).

The Court must first determine whether the Appeals Council *mandated* the testimony of a medical expert or a consultative examination to test plaintiff's pulmonary function status.  In *Albright v. Soc. Sec. Comm'r*, No. 16-14100, 2018 WL 5094084 (E.D. Mich. Feb. 7, 2018), *report and recommendation adopted*, 2018 WL 4560921 (E.D. Mich. Sept. 24, 2018), the Appeals Council had vacated and remanded an ALJ's decision finding that a plaintiff was not disabled.  *Id.* at *1.  In its order, the Appeals Council had "explicitly [said] that updated evidence should be ordered 'in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 C.F.R. [§§] 404.1512-1513 and 416.912-913)' and '*may include, if warranted and available*, a consultative examination and medical source statements about what the claimant can still do despite the impairment.'"  *Id.* at *13 (quoting the Appeals Council's order).  The *Albright* court found that this language, expressly incorporating regulations contemplating discretion regarding consultative examinations, did not compel further examination.  *Id.*  It upheld the ALJ's denial of the claim after remand without a further

14

consultative examination, where the evidence was not inconsistent or insufficient and the ALJ's

decision was based on substantial evidence.  *Id.*

Like in *Albright*, the Appeals Council's 2017 decision here incorporates "regulatory

standards regarding consultative examinations and existing medical evidence (20 CFR

416.912)."  (Tr. 169).  The Appeals Council noted that "[f]urther evaluation under Listing 3.02A

*appears* to be necessary, and the assistance of a medical expert *may be warranted* for that

purpose."  (Tr. 168) (emphasis added).  While it directed the ALJ to "[o]btain additional

evidence concerning the claimant's impairments in order to complete the administrative record in

accordance with the regulatory standards regarding consultative examinations and existing

medical evidence[,]" (Tr. 169), it qualified the directive, stating that such additional evidence

"*may* include, *if warranted* . . . a consultative physical examination. . . ."  (*Id.*) (emphasis added).

In its subsequent 2019 order, the Appeals Council found no error in the ALJ's failure to

order a further consultative exam.  (Tr. 1).  Had it construed its 2017 decision to require a

consultative exam without qualification, this is unlikely to have been the case.  *See Schults v.

Colvin,* 1 F. Supp. 3d 712, 717-18 (E.D. Ky. 2014) ("Although not dispositive of this issue, it is

worth noting that the Appeals Council upheld the ALJ's second hearing decision.  It stands to

reason that the Council would only have upheld the decision if it was satisfied with the ALJ's

development of the record.").

The Court finds that the Appeals Council did not mandate the testimony of a medical

expert to assist with Listing 3.02A or a consultative exam to conduct additional spirometry tests.

Rather, the Appeals Council's 2017 order suggests that the record was insufficient to support the

ALJ's *affirmative* finding of disability; it does not endorse (and in fact vacates) the entirety of the ALJ's partially favorable decision. (Tr. 168). Similarly, the Appeals Council's directive to "*as necessary*, obtain opinion evidence regarding the earliest onset date . . . and the duration . . . of the claimant's impairments *if they are found to exist at disabling levels during the period at issue*" suggests that further record development was necessary only if the original disability determination withstood the ALJ's review on remand. (Tr. 169) (emphasis added). Accordingly, the Appeals Council's decision did not mandate the ALJ on remand to obtain a consultative examination to test plaintiff's pulmonary function status or to obtain the services of a medical expert at the ALJ hearing.

### 2. The ALJ's 2018 determination as to Listing 3.02A

Short of being required by the Appeals Council's order, the Court next determines whether the ALJ was otherwise required to obtain a medical expert's testimony or consultative examination on remand. In general, "[t]he ALJ has discretion to determine whether additional evidence is necessary." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (citing *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)). The responsibility for record development in the disability context is subject to some tension in relevant law and regulations. On one hand, under 20 C.F.R. § 416.945(a)(3), "before [the Social Security Administration] make[s] a determination that you are not disabled, [it is] responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources." *See also id.* at § 416.912(b)(1) ("Before [the Social Security Administration] make[s] a

determination that you are not disabled, we will develop your complete medical history. . . . We will make every reasonable effort to help you get medical evidence. . . .").  The Sixth Circuit has noted that "develop[ing] a full and fair record" is a "basic obligation" of the ALJ.  *Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 344 (6th Cir. 2008) (quoting *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983)).  On the other hand, under 20 C.F.R. § 416.912(a)(1), "[i]n general, you have to prove to us that you are . . . disabled."  A plaintiff has the burden of proof on the first four steps of the disability evaluation process.  *Rabbers*, 582 F.3d at 652; *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) ("[T]his court repeatedly affirms that the claimant bears the ultimate burden of proving disability.") (citation omitted).  Balancing these competing principles, the Sixth Circuit has held that the duty to conduct a full inquiry "does not require [record development] at government expense unless the record establishes that such [record development] is *necessary* to enable the [ALJ] to make the disability decision."  *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)).

Although plaintiff does not attempt to invoke it, there is a heightened duty to develop the record where a claimant is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures. . . ."  *Wilson*, 280 F. App'x at 459.  *See also Lashley*, 708 F.2d at 1051 (holding that an ALJ has a "special duty [to fully develop the record] . . . where the claimant appears without counsel.").  In this case, plaintiff had the assistance of a non-attorney representative.  The Sixth Circuit has held, in at least one unpublished decision, that the fact of non-attorney representation, without more, does not trigger a heightened duty of the ALJ

17

to develop the record.  *See Kidd*, 283 F. App'x at 344-45.  Regardless of the appropriate level of scrutiny, however, "[t]here is no bright line test for determining when the [ALJ] has . . . failed to fully develop the record.  The determination in each case must be made on a case by case basis." *Lashley*, 708 F.2d at 1052.  At base, the adequacy of the record turns on whether the ALJ's conclusion on Listing 3.02A is "supported by substantial evidence."  *Foster*, 279 F.3d at 356 (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986)).

### a. Medical expert for Listing 3.02A

Plaintiff first argues that the ALJ was required to obtain a medical expert opinion to assist with the Listing 3.02A determination.   As determined above, the Appeal Council's order did not compel the ALJ to obtain a medical expert's testimony, and a medical expert was not otherwise mandatory under relevant agency guidelines.  *See* HALLEX 1-2-5-34(A)(1) (listing situations in which medical expert opinions are mandatory, none of which apply in this case).  Short of such a mandate, the ALJ's 2018 decision reflects the she had sufficient evidence to make a Listing 3.02A determination without obtaining a medical expert's testimony:

> [An FEV1 of 0.99] satisfied the criteria of then-existing Listing 3.02, as well as current Listing 3.02, regardless of the claimant's height.  However, neither the decision nor the record indicates that value is "satisfactory" or "reproducible" as required in the preface to Section 3.00.  Specifically, Section 3.00E sets out the technical requirements for pulmonary function testing.  The preface indicates that spirometry values "should represent the largest of at least three satisfactory forced expiratory maneuvers" and goes on to further define the requirements of satisfactory and reproducible test values.  Yet the spirometry test forming the sole basis for the prior Administrative Law Judge's finding that the claimant's impairment meets Listing 3.02A documented only a single FEVI value.  It likewise contained no discernible data or conclusions about test conditions, reproducibility, effort, and the like, as required by Section 3.00E.

(Tr. 19).

18

The medical record of plaintiff's January 2016 pulmonary visit, which generated the FEV1 0.99 result, substantially supports the ALJ's finding that the spirometry test did not meet the requirements of Section 3.00E.  (*See* Tr. 1015-40).[4]  The January 2016 records do not show the requisite number of at least three forced expiratory maneuvers during the same session or that such maneuvers were "satisfactory" as defined in Section 3.00E.  Nor do the January 2016 records include a spirometry report that shows "[l]egible tracings of your forced expiratory maneuvers in a volume-time format. . . ."  20 CRF Part 404, Subpart P, App.1 § 3.00E(3)(c).  This evidence was sufficient for the ALJ to determine that the single FEV1 value set forth in the January 2016 medical record did not satisfy Listing 3.02A in this regard.  The ALJ properly exercised her discretion to not consult a medical expert.  There is no evidence here that the failure to do so "denied [plaintiff] a full and fair hearing."  *Kidd*, 283 F. App'x at 345 (quoting *Duncan*, 801 F.2d at 856).  A medical expert was unnecessary to assist in the evaluation of a spirometry test that did not pass technical muster in the first place.

### b.  Consultative examination regarding pulmonary function

Plaintiff next argues that because the ALJ found the January 2016 pulmonary function test to be substantial evidence to support the ALJ's 2016 partial disability finding, this warranted a regulatorily compliant pulmonary function test on remand to clarify the record as to Listing 3.02A.  Plaintiff also states that she sought, independently, an updated pulmonary function test

---

[4] The ALJ also found that "the evidence does not reflect signs or findings, including spirometry or pulmonary function testing findings, that meet or equal Listing 3.03 [Asthma]. . . ."  (Tr. 19).  The ALJ cited three records for this conclusion: a November 18, 2013, pulmonary function test performed as part of a consultative examination (Tr. 610-22), a January 13, 2014, diffusing capacity test performed as part of a consultative examination (Tr. 623-29), and UC Health records between June 2015 and January 2016 (Tr. 1014-1130).  Plaintiff does not raise any issue with this finding by the ALJ, and the medical records cited exhibit the same deficiencies under 3.00E as the record that underpinned the ALJ's 2016 Listing 3.02A determination.

for the proceedings on remand during a January 2018 pulmonary visit, but it could not be performed because of her poor medical condition at that time.  As a result, plaintiff sent a letter to the ALJ requesting that she secure an updated pulmonary function test.  (Tr. 451).  The ALJ declined the request in the body of her unfavorable decision, leaving plaintiff without the opportunity secure the test on her own.  (Tr. 13).

The Commissioner counters that the lack of a regulatorily compliant pulmonary function test does not place the onus on the ALJ to seek a consultative exam and that the existing medical record was otherwise sufficient for the ALJ to make a determination.  With respect to plaintiff's independent request for the consultative examination on remand, the Commissioner argues that the record did not support the contention that her medical condition was too poor to undergo an updated pulmonary function test during her January 2018 pulmonary visit.

The Commissioner points to two decisions upholding unfavorable disability determinations without further consultative examinations where, as here, spirometry tests exhibited fewer than three forced expiratory maneuvers.  *See Risner v. Comm'r of Soc. Sec.*, No. 2:17-cv-627, 2018 WL 3301420, at *8 (S.D. Ohio July 5, 2018) ("[The test report] does not establish that Plaintiff underwent three forced expiratory maneuvers as Listing 3.00(E) requires. This alone renders the test insufficient to establish that Plaintiff meets the Listing criteria [of 3.02A.]"); *Ross v. Comm'r of Soc. Sec.*, No. 2:18-cv-160, 2018 WL 6074469, at *4 (S.D. Ohio November 21, 2018), *report and recommendation adopted*, 2019 WL 188043 (S.D. Ohio January 14, 2019) (same).

20

Plaintiff does not attempt to distinguish *Risner* or *Ross* but instead cites *Johnson v. Sec'y of Health and Human Servs.*, 794 F.2d 1106 (6th Cir. 1986) to support her contention that the ALJ was required to specifically consider Section 3.00E of the Listings on remand and "develop the record fully and fairly as to all the component parts of that Listing." (Doc. 21 at PAGEID#: 1498 n.1). In *Johnson*, the Sixth Circuit considered an ALJ's determination that the claimant did not meet the then applicable obesity listing. *Id.* at 1109. The obesity listing required satisfaction of two factors: (1) a weight that equaled or exceeded a certain level, and (2) evidence of one of several related conditions. *Id.* at 1110. There was no dispute over the first factor, and the claimant believed he had satisfied the second factor based on the related condition of "[h]istory of pain and limitation of motion in any weight bearing joint or spine (on physical examination) associated with X-ray evidence of arthritis in a weight bearing joint or spine. . . ." *Id.* The claimant's prior back problems satisfied the first element of the related condition (history of pain and limitation of motion in the spine), but the second element (evidence of arthritis) was unclear. *Id.* at 1110-11. One doctor reported arthritis without observations or clinical findings, and another doctor took x-rays showing "degenerative changes" but did not label them as arthritis. *Id.* at 1110. In addition, the ALJ in *Johnson* stated that he found "marked limitation of movement and documented arthritis" and yet found that the claimant *did not* meet the listing. *Id.* at 1111. Due to "[t]he lack of clear medical evidence, in light of the impairments suggested by the physicians" and "findings that appear[ed] contradictory," the court found that the ALJ "failed to develop the factual record fully and fairly." *Id.* at 1111 (citation omitted).

The cases cited by the parties confirm the principle that an ALJ has discretion to obtain (or not) further medical evidence provided that her decision ultimately rests on substantial evidence. *Johnson* stands for the proposition that where relevant parts of the medical record are in conflict or remarkably incomplete, an ALJ's duty may require further record development. With that in mind, the Court returns to the ALJ's 2018 decision on remand and the relevant medical record.

The ALJ determined that there was "no evidence of any pulmonary function testing, including the January 2016 pulmonary function testing that satisfies the criteria of Listing 3.02." (Tr. 19). The ALJ declined to order a further pulmonary function test because "the treatment notes [regarding the January 2018 pulmonary visit] d[id] not support [plaintiff's] assertion [that her lungs were "too bad" to be tested]. . . ." (Tr. 13). The ALJ found that the medical record associated with this visit did not "indicate that [plaintiff] needed to return with any urgency" and rather reflected that her "symptoms were treated as a flare up." (*Id.*). Finally, the ALJ found that plaintiff's lack of further pulmonary treatment through February 28, 2018 belied any suggestion that she required immediate further medical attention. (*Id.*)

The medical records most pertinent to the ALJ's Listing 3.02A determination are plaintiff's January 2016 pulmonology visit with Dr. Rashkin, her August 2017 visit with Dr. Schlanger, and her January 2018 pulmonology visit with Drs. Lenz and Sengupta—the latter two visits occurring after the Appeals Council's 2017 order vacating and remanding the ALJ's 2016 partially favorable decision. The January 2016 pulmonary visit produced the potentially relevant FEV1 0.99 result, with Dr. Rashkin noting his consideration of "independent review of

22

pulmonary function test" and suggesting a follow-up appointment in four months.  (Tr. 989).  At

the January 2018 pulmonary visit, Dr. Lenz diagnosed "**Moderate Persistent Asthma vs.**

**COPD or COPD/Asthma Overlap Phenotype** with Dx with spirometry confirming obstruction

with more fixed ratio FEV1/FVC at 0.46 and FEV1 01.13 L post BD with (+) BD response. . . ."

(Tr. 1371).  Dr. Sengupta noted "exacerbation today, with worsening cough, sputum [bilateral]

expiratory wheezing and drop in peak flow" as compared with "when she was healthy back in

2016. . . ."  (Tr. 1386).  Drs. Lenz and Sengupta did not delineate a specific follow-up schedule[5]

and both anticipated outpatient management of the condition, though their notes imply some

deterioration in condition.  (Tr. 1371).  Between these two pulmonary visits, Dr. Schlanger

assessed what was "previously" moderate persistent asthma (Tr. 1208) as "severe/persistent

asthma" (Tr. 1211).  As part of her plan for plaintiff, Dr. Schlanger noted "repeat [pulmonary

function tests]."  (Tr. 1209).

Although there is some evidence to suggest that plaintiff's condition may have been

deteriorating and that Drs. Rashkin, Schlanger, Sengupta, and Lenz were interested in further

pulmonary function review and/or testing, the ALJ had sufficient evidence to make her

unfavorable disability determination without a consultative examination on plaintiff's pulmonary

condition.  The most recent medical record from January 2018 does not reflect an immediate

need for follow-up care or a pulmonary function test and instead contemplates that plaintiff could

continue to manage her condition, notwithstanding the flare up.  This substantially supports the

ALJ's determination that plaintiff's lungs were not "too bad" to be tested in January 2018.  (*See*

---

[5] The physicians' notes do contemplate "follow[ing] up" about plaintiff's attempt to quit smoking "at her next visit[.]"  (Tr. 1377).

Tr. 13).  The most relevant medical records do not display any conflict among medical opinions or obvious information gaps as in *Johnson* such that a consultative examination was needed to fully develop the record.  Consistent with the ALJ's 2018 decision, the medical evidence displays a lack of any regulatorily compliant evidence sufficient to meet Listing 3.02A.

Accordingly, the ALJ adequately developed the record without the opinion of a medical expert or a pulmonary consultative examination.  Her decision that plaintiff did not meet Listing 3.02A was based on substantial evidence.  Plaintiff's first assignment of error should be overruled.

### 3.  The ALJ's RFC determination

Plaintiff argues that the ALJ erred in determining that she had an RFC for a restricted range of light work.[6]  Plaintiff challenges this determination based only on her pulmonary and musculoskeletal problems.  She primarily challenges the ALJ's reliance on the non-examining state agency physicians because their reports predate relevant pulmonary and orthopedic records by several years.  She also argues that newer evidence in the record demonstrates a deteriorating condition and invasive treatments for her musculoskeletal condition.  Finally, plaintiff faults the ALJ for improperly considering her daily activities in determining her RFC.[7]  The Commissioner counters that the ALJ reasonably determined plaintiff's RFC based on the medical evidence, her treatment history, her activities of daily living, and the medical opinions of record.

---

[6] Plaintiff argues that if she were limited to sedentary work, she would meet Rule 201.10's determination of disabled under the Medical-Vocational Guidelines.  *See* 20 C.F.R. § 404, Subpart P, App. 2, Table No. 1.  Plaintiff is an individual closely approaching advanced age with limited education and previous semi-skilled work experience (cashier).  (*See* Doc. 12 at PAGEID #: 1456 n.5; Tr. 17-18).

[7] Plaintiff also argues that the ALJ failed to explain how plaintiff's having worked side jobs in 2011 was related to her allegations and symptoms—a problem identified by the Appeals Council in its 2017 order.  (*See* Tr. 169).  But because the ALJ did not raise this issue in her 2018 decision, it is not necessary for the Court to address this argument.

Physicians render opinions on a claimant's RFC, but the ultimate responsibility for determining a claimant's capacity to work lies with the Commissioner.  *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(B); *Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 578 (6th Cir. 2009)).  The ALJ is responsible for assessing a claimant's RFC at the hearing level based on all the relevant medical and other evidence.  20 C.F.R. § 416.946(c).

On remand, the ALJ found the record reflected "treatment, findings, and activities of daily living that are not consistent with debilitating conditions and do not support the severity, intensity, or frequency of limitations alleged by the claimant."  (Tr. 22).  The ALJ "accord[ed] great weight to the determination of the State agency medical consultant, as it was well supported by, and consistent with the substantial medical evidence of record; however, additional respiratory limitations were added to the claimant's [RFC] due to her ongoing history of chronic obstructive pulmonary disease findings."  (Tr. 24-25).  These limitations included that "[plaintiff] can frequently climb ramps or stairs, but occasionally climb ladders, ropes, or scaffolds[,]" and plaintiff "must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation, and unprotected heights."  (Tr. 21).

The State agency medical consultant, Dr. Cruz, signed her report on January 22, 2014 (Tr. 118), which predates the most pertinent medical evidence that was before the ALJ on remand.  Plaintiff argues that Dr. Cruz's report is therefore unreliable.  Other than emphasizing certain parts of the medical record that tend to show more severe symptoms, however, plaintiff does not identify any specific evidence that undermines the ALJ's reliance on the report.

Moreover, the fact that a State agency medical consultant's report is outdated does not mean that it should not be considered; instead, the report must be considered in conjunction with the more recent medical evidence. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (affirming an ALJ's reliance on an outdated state agency opinion where the ALJ "considered the medical examinations that occurred after [the state agency physician]'s assessment" and "took into account . . . relevant changes in [the plaintiff's] condition"). As discussed below, the ALJ carefully considered plaintiff's most recent medical records in assessing plaintiff's RFC.

As the ALJ reasonably determined, the evidence of plaintiff's pulmonary impairment was not consistent with a debilitating condition, and her physical examinations generally yielded normal findings despite transient findings of wheezing. (Tr. 22-23). In July 2015, plaintiff's primary care physician noted normal pulmonary/chest effort and breath sounds on physical exam. (Tr. 1098). In August 2015, pulmonary records reflected wheezing in all lung fields but "no respiratory distress" and normal pulmonary/chest effort. (Tr. 997). In December 2015, plaintiff exhibited wheezing but was in "no respiratory distress" and was diagnosed with acute bronchitis. (Tr. 957-58). A January 2016 pulmonary examination showed wheezing but no stridor, respiratory distress, rales, or tenderness and normal pulmonary/chest effort. (Tr. 986). Physical examination in August 2017 showed normal pulmonary/chest effort with "[l]ungs somewhat tight but moving air, no wheezes." (Tr. 1211). The January 2018 progress notes reflect that plaintiff's respiration was "[c]lear to auscultation bilaterally, no wheezes or crackles, no increased work of breathing." (Tr. 1376).

In addition, the ALJ acknowledged that the record showed some transient findings of a slow, steady gait that was slightly wide based, but she reasonably determined that the overall evidence of record reflected a gait within normal limits and other normal musculoskeletal findings.  (Tr. 23).  An August 2014 lumbar spine X-ray showed "mild, multilevel degenerative changes and facet disease of the lumbar spine" but "[n]o evidence of an acute fracture."  (Tr. 838).  In December 2014, plaintiff exhibited a "normal gait . . . no edema or varicosities[.]"  (Tr. 794).  In January 2015, plaintiff had no edema or tenderness.  (Tr. 686, 705).  In March 2015, plaintiff's physical exam revealed a "[n]ormal range of motion . . . no edema and no tenderness."  (Tr. 670).  A lumbar spine MRI that same month reflected "[m]ild degenerative changes from L3-S1 without significant stenosis or neural impingement[,] [m]ild foraminal narrowing . . . without nerve root impingement."  (Tr. 652).  In July 2015, plaintiff's musculoskeletal exam showed no edema.  (Tr. 1099).  A September 2015 lumbar spine X-ray showed mild disc narrowing that was unchanged from the March 2015 MRI and no acute fractures.  (Tr. 1045).  In January 2016, plaintiff exhibited a "[n]ormal range of motion" and "no edema or tenderness."  (Tr. 980).  A cervical spine CT scan in April 2016 showed no acute fracture or subluxation and mild-moderate, multilevel degenerative changes.  (Tr. 1173-74).  A bilateral hip X-ray in July 2016 showed mild degenerative issues but no acute fracture or dislocation.  (Tr. 1146).  Over one year later, at her next doctor's visit in August 2017, plaintiff's physical findings included edema and a "[n]ormal range of motion."  (Tr. 1210).  The generally mild and normal examination findings substantially support the ALJ's conclusion that plaintiff did not suffer from debilitating physical impairments that would limit her to sedentary work.

27

The ALJ also reasonably determined that the record of plaintiff's treatment was not consistent with the alleged severity of plaintiff's symptoms. (Tr. 22). The ALJ found no record of "inpatient hospitalization, emergency treatment, or intensive treatment with a specialist" and that "conservative, routine treatment" prevailed over "invasive treatment, such as injections or surgery." (Tr. 22). Although plaintiff *was* administered a Toradol shot in May 2015 and referred for a follow-up with a Dr. Gupta (Tr. 963), there is no record of such a follow-up. She was also referred for an epidural steroid injection in September of 2015 (Tr. 1060) but did not follow through on the referral (Tr. 957). Finally, the ALJ noted a record of certain actions by plaintiff that were inconsistent with her allegations of severe pain and limitations: running out of medications (Tr. 1124), continued smoking (Tr. 1099, 1103-04, 1210, 1250, 1254), and infrequency in specialist treatment (Tr. 1210, 1372).[8] *See Simpson v. Comm'r of Soc. Sec.*, No. 1:14-cv-801, 2016 WL 74420, at *11 (S.D. Ohio Jan. 6, 2016), *report and recommendation adopted*, 2016 WL 1223007 (S.D. Ohio Mar. 29, 2016) ("The ALJ properly discounted plaintiff[']s disability based on evidence showing that plaintiff failed to fully comply with prescribed treatment and treatment advice.") (citations omitted).

The ALJ properly considered evidence of plaintiff's ability to engage in various daily activities, such as living alone, personal care, food preparation, minimal cleaning, limited shopping, and attending doctor's appointments. (Tr. 24). While a "plaintiff's ability to engage in daily activities does not establish *ipso facto* that she is able to engage in gainful activity 40 hours per week[,]" *Barnhorst v. Comm'r of Soc. Sec.*, No. 1:10-cv-526, 2011 WL 3811462, at

---

[8] While the record reflects that plaintiff's son passed away in late 2016, this does not wholly negate the ALJ's finding that she followed up with a pulmonary specialist only once between January 2016 and February 2018. (Tr. 13).

*16 (S.D. Ohio Aug. 5, 2011), *report and recommendation adopted*, 2011 WL 3812639 (S.D. Ohio Aug. 26, 2011), "the ALJ may consider the claimant's testimony of limitations in light of other evidence of the claimant's ability to perform other tasks. . . ." *Simpson*, 2016 WL 74420, at *10 (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001)) (remaining citations omitted).  The ALJ's consideration of plaintiff's daily activities was only one of several rationales for her decision finding that plaintiff was not as limited as she alleged.

The ALJ's decision that plaintiff had an RFC for a range of light work with restrictions is supported by substantial evidence, including the state agency physician's report, recent medical records showing mild or minimal objective findings, and plaintiff's record of treatment and daily activities.  Plaintiff's second assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED** and this matter be **CLOSED** on the docket of the Court.

Karen L. Litkovitz
United States Magistrate Judge

29

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

BARBARA A. CRAIG                                     Case No. 1:19-cv-764
      Plaintiff,                                     Barrett, J.
                                                    Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).